**WO**

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| JetEx, LLC, a Wyoming limited liability company; Arch Insurance Company, a Missouri corporation,<br><br>Plaintiffs,<br><br>vs.<br><br>Ross Scottsdale, LLC d/b/a/ Scottsdale Air Center, a Delaware limited liability company,<br><br>Defendant. | No. CV-09-01561-PHX-NVW<br><br>**ORDER** |

Before the Court are "Defendant's Motion for Summary Judgment" (Doc. 82), Plaintiffs' "Motion in Limine to Exclude the Testimony of Expert Witness Dale B. Edwards, P.E." (Doc. 89), and Plaintiffs' "Motion in Limine to Exclude the Testimony of Expert Witness Juergen Janzik" (Doc. 90). For the reasons stated below, the summary judgment motion and the motion to exclude the testimony of Dale Edwards will be denied. The motion to exclude the testimony of Juergen Janzik will be granted in part and denied in part.

**I.   LEGAL STANDARDS**

   **A.   *Daubert* Motion Standard**

When one party challenges another's evidence, including expert evidence, Federal Rule of Evidence 104(a) requires this Court to determine, by a preponderance of proof,

that the evidence is admissible. *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 592–93 & n.10 (1993). *Daubert* and *Kumho Tire* establish that district courts must "ensure that any and all [expert] testimony . . . is not only relevant, but reliable." *Daubert*, 509 U. S. at 589; *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 147 (1999). This does not mean that the party proffering expert testimony must "prove their case twice — they do not have to demonstrate to the judge by a preponderance of the evidence that the assessments of their experts are correct, they only have to demonstrate by a preponderance of evidence that their [experts'] opinions are reliable." *In re Paoli R.R. Yard PCB Litigation*, 35 F.3d 717, 744 (3d Cir. 1994) (emphasis in original).

Federal Rule of Evidence 702, amended in 2000 to reflect the requirements of *Daubert* and *Kumho Tire*, describes the issues a court must consider when evaluating the reliability of challenged expert testimony:

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.

Fed. R. Evid. 702. But again, "the test . . . is not the correctness of the expert's conclusions but the soundness of his methodology." *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 43 F.3d 1311, 1318 (9th Cir. 1995) (remand decision). "Vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence . . . [that otherwise] meets the standards of Rule 702." *Daubert*, 509 U.S. at 596.

### B. Summary Judgment Standard

Summary judgment is warranted if the evidence shows there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). The moving party bears the initial burden of identifying those portions

of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of any genuine issue of material fact. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). If the nonmoving party would bear the burden of persuasion at trial, the moving party may carry its initial burden of production by submitting admissible "evidence negating an essential element of the nonmoving party's case," or by showing, "after suitable discovery," that the "nonmoving party does not have enough evidence of an essential element of its claim or defense to carry its ultimate burden of persuasion at trial." *Nissan Fire & Marine Ins. Co., Ltd. v. Fritz Cos., Inc.*, 210 F.3d 1099, 1105–06 (9th Cir. 2000).

When the moving party has carried its burden, the nonmoving party must respond with specific facts, supported by admissible evidence, showing a genuine issue for trial. *See* Fed. R. Civ. P. 56(c). But allegedly disputed facts must be material — the existence of only "*some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48 (1986) (emphasis in original).

Where the record, taken as a whole, could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue of material fact for trial. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). However, the nonmoving party's properly presented evidence is presumed to be true and all inferences from the evidence are drawn in the light most favorable to that party. *Eisenberg v. Ins. Co. of N. Am.*, 815 F.2d 1285, 1289 (9th Cir. 1987).

**II. FACTS**

The following facts are undisputed unless attributed to a specific party. Plaintiff JetEx, LLC, owns a Cessna Citation airplane, FAA registration number N990JH, and Plaintiff Arch Insurance Company insured this airplane. The Court will refer to JetEx and Arch Insurance collectively as "JetEx." Defendant Scottsdale Air Center is a business operating at the Scottsdale Municipal Airport. Among other things, Scottsdale Air Center provides a hangar, staging area, and parking for private jets. This lawsuit is

1 about damage to JetEx's airplane allegedly inflicted while it was in Scottsdale Air Center's care.

On November 7, 2008, a man named Jake Harouny flew JetEx's airplane from Salt Lake City to the Scottsdale Municipal Airport. Before that flight, Harouny had arranged for Scottsdale Air Center to take care of the airplane during his stay in Arizona, and for another company operating at the Scottsdale airport, The Allen Group, to wash the plane. Therefore, when Harouny arrived in Scottsdale, he taxied to Scottsdale Air Center's facilities, shut off the engine, and turned the airplane over to Scottsdale Air Center. Certain Scottsdale Air Center personnel then visually inspected the airplane for damage. According to the inspection record, the only problem noted was a paint chip on the left wing.

Sometime after this inspection, Scottsdale Air Center towed the airplane to a parking location some distance away from its main facilities. The next day, Scottsdale Air Center towed the airplane to the hangar used by The Allen Group for cleaning. Allen Group employees discovered substantial damage to the airplane's left wing. According to photographs submitted earlier in this case, the damage appears to comprise two substantial scratches running parallel to each other from the wing's leading edge along the underside. One scratch runs all the way to the trailing edge and aileron. The other scratch does not run as far, but it appears to have left a noticeable gash about midway through its course. Both gashes contain streaks of green paint presumably deposited by whatever caused the damage. Arch Insurance paid for the repairs necessary to correct this damage.

JetEx claims that Harouny and others inspected the airplane before it left Salt Lake City and noticed no damage at that time. Harouny also claims that he encountered nothing at the Salt Lake City airport, in flight, or at the Scottsdale Municipal Airport that could have caused such damage. JetEx therefore sued Scottsdale Air Center for negligent property damage (including through a *res ipsa loquitur* theory) and for breach of an implied bailment-for-hire contract.

- 4 -

### III. JETEX'S MOTION TO EXCLUDE JANZIK'S EXPERT TESTIMONY

#### A. Background

Scottsdale Air Center denies that JetEx's jet was damaged at its facilities, and it hired Juergen Janzik to help determine what *did* cause the damage. Janzik has been a pilot since the late 1950s, having served as a military fighter pilot, corporate pilot, flight instructor, and aviation consultant. He has approximately 24,000 hours of flight experience, and has flown many different types of aircraft.

Janzik began his investigation by touring the Scottsdale Municipal Airport, looking for objects that could have caused parallel gashes on the underside of a Cessna Citation wing. Finding nothing that satisfied him, Janzik formed the opinion that the airplane likely was not damaged at the Scottsdale Municipal Airport. Janzik then visited airports to which Harouny had flown the airplane before flying it to Scottsdale. As it turns out, the last time Harouny flew the plane before his Scottsdale trip was a round-trip excursion between Salt Lake City and Mount Pleasant, a rural community in central Utah. At Mount Pleasant's small, unattended airport, Janzik noticed a row of six steel fence posts next to the parking ramp. The fourth and fifth fence posts were bent in a direction Janzik thought would be consistent with having been struck by an airplane wing. The fence posts had a T-shaped profile that apparently matched the shape of the gouges on the airplane's wing. Based on the height of those fence posts, their location, and the height of the airplane wing at issue, Janzik theorized that Harouny performed an unusual turning maneuver (pivoting on a main gear) on the Mount Pleasant parking ramp in such a way that Harouny accidentally dragged the airplane's left wing over the top of two fence posts.

Curious about how Harouny could damage his airplane in that way without hearing it, Janzik later conducted something of an experiment. He got into the cockpit of a Cessna Citation similar to JetEx's and asked someone outside the plane to bang on the wing with a flashlight. Janzik reported that the sound of the flashlight banging on the wing did not transmit to the cockpit when then airplane's engines were running. Thus,

Janzik believes that Harouny could have damaged the airplane without knowing it. Janzik also believes that the damage was aerodynamically irrelevant, and Harouny therefore would not have noticed any difference when flying the plane from Mount Pleasant back to Salt Lake City, or from Salt Lake City to Scottsdale.

When Janzik was asked at his deposition how Harouny could have missed such damage in his preflight inspection before flying to Scottsdale, Janzik speculated that pilots who frequently fly a certain airplane sometimes become lax in their inspection procedures. But Janzik admitted that he did not know anything about Harouny's inspection habits. Janzik further admitted that he did not know whether Harouny ever performs the turning maneuver he would have needed to perform to drag his wing over the fence posts.

**B.      Analysis**

JetEx now challenges Janzik's testimony as impermissibly speculative. JetEx first argues that Janzik should not be allowed to offer an expert conclusion that the airplane damage likely did not happen at the Scottsdale Municipal Airport. This argument has partial merit. Janzik may appropriately testify as a percipient witness that he saw nothing during his tour of the Scottsdale Municipal Airport that looked capable of causing the type of damage at issue here, but Scottsdale Air Center has not shown that Janzik applied any "scientific, technical, or other specialized knowledge" in this endeavor that could "assist the trier of fact," *see* Fed. R. Evid. 702, beyond the testimony of any other individual who has walked around the airport looking for something that could create parallel gashes on the underside of an airplane wing. Accordingly, Janzik may not give an expert opinion that the damage did not happen at the Scottsdale Municipal Airport.

JetEx also argues that Janzik should not be allowed to express an opinion about the care that some pilots take, or fail to take, when inspecting aircraft that they fly frequently. JetEx does not argue that Janzik lacks the experience to support such an opinion, but rather that it has no relevance to what Harouny actually did in this case. Although JetEx is correct that Janzik cannot opine about what Harouny did, his

"specialized knowledge" about pilots generally could "assist the trier of fact," *id*., in deciding whether a preflight inspection would have necessarily revealed the damage. The answer to that question in turn could assist the jury to decide whether the evidence supports Scottsdale Air Center's contention that Harouny damaged the airplane before flying to Scottsdale. Thus, Janzik's testimony about pilots' diligence with inspections will not be excluded.

JetEx also offers a number of arguments generally attacking Janzik's methodology: *e.g.*, the fact that he did not account for the softness of the dirt at the Mount Pleasant airport, and therefore does not know if the dirt could have held up the stakes with enough sturdiness to permit them to gouge the underside of the wing; the fact that banging a flashlight on a wing does not precisely recreate the conditions of the alleged damage incident; and the unusual nature of the turning maneuver required to drag the wing over the fence posts. These claims go to weight, not admissibility or reliability. Accordingly, the Court will not exclude them as improper expert testimony. JetEx's motion in limine to exclude Janzik's testimony will therefore be denied except that Janzik may not testify that the airplane likely was not damaged at the Scottsdale Municipal Airport.

**IV.   JETEX'S MOTION TO EXCLUDE EDWARDS'S EXPERT TESTIMONY**

   **A.   Background**

Hopefully to support Janzik's theory of damage inflicted at the Mount Pleasant airport, Scottsdale Air Center hired an expert to compare samples of green paint obtained from the damaged areas of the wing with samples of paint taken from the fence posts that supposedly caused the damage. Plaintiff's paint expert, Dale Edwards, obtained a B.S. in chemical engineering from the University of Illinois in 1978 and he took graduate courses in materials engineering at the Illinois Institute of Technology in the early 1980s. He is a licensed professional engineer and has been working in the engineering consulting business for approximately thirty years. The bulk of Edwards's experience appears to have been in the area of plastics (especially plastic piping and tubing), but he

1  testified to previous experience in comparing paint samples through a micro-FTIR
2  spectrum test and a SEM-EDS test. In simple terms, a micro-FTIR spectrum test discerns
3  a compound's elemental composition by measuring its light absorption properties, and an
4  SEM-EDS test discerns a compound's elemental composition by measuring its emissions
5  when bombarded with charged particles.

6  Edwards used the micro-FTIR and SEM-EDS tests to compare samples of paint
7  from the damaged area of the airplane wing and from the steel fence posts at the Mount
8  Pleasant airport. Edwards's micro-FTIR test revealed a very similar elemental
9  composition for both paint samples. His SEM-EDS test also revealed a similar
10 composition, but with certain noticeable differences. Specifically, the fence post sample,
11 but not the wing sample, contained a strong phosphorous component. Conversely, the
12 wing sample contained copper and nitrogen not discernible in the fence post sample.
13 Through his expert report and subsequent deposition, Edwards theorized that the
14 phosphorous in the fence post sample may have been contamination from dirt or dust,
15 considering the fence post's outside location in a rural area, but Edwards performed no
16 tests to confirm this theory. Regarding the copper in the wing sample, Edwards theorized
17 at his deposition that it came from the aluminum alloy from which the wing was made,
18 but he performed no tests on this theory. Edwards's expert report says nothing about the
19 nitrogen in the wing sample, nor was he asked about it at his deposition.

20 **B.     Analysis**

21 JetEx argues that Edwards is not qualified as a paint comparison expert because he
22 characterizes his analysis as "qualitative" rather than "quantitative." The parties do not
23 clearly explain what they mean by "qualitative" vs. "quantitative" in this context. As best
24 as can be discerned, it appears that it may be Edwards's way of saying that the two paint
25 samples came from different environments (the one from an aluminum alloy airplane
26 wing, the other from a steel fencepost), and the different provenance, so to speak,
27 prevents any perfectly objective, instrument-only, no-interpretation-needed way of
28

- 8 -

comparing these paint samples. Accordingly, there will always need to be a "trained eye" to interpret the data and form an opinion about whether the paint samples are the same.

JetEx, for its part, believes that if Edwards is correct about this quantitative/qualitative difference, then he does not have the needed "trained eye" because helacks the necessary experience in comparing paint samples "qualitatively." But JetEx does not contest Edwards's ability to run the micro-FTIR and SEM-EDS tests, nor does JetEx argue that Edwards ran the tests improperly (*eg.*, in a contaminated environment). JetEx primarily attacks Edwards's interpretation of his results. Perhaps there comes a point where a proposed expert's interpretations are so far removed from the available data that he or she reveals his or her lack of qualification to testify with the title of "expert." But that case does not exist here. Edwards is qualified to testify as an expert regarding the tests he performed on the paint samples.

JetEx next argues that Edwards's methodology is unreliable. This argument is somewhat incongruous given that JetEx has not challenged the reliability of micro-FTIR or SEM-EDS generally, the use of such tests to compare paint samples, Edwards's ability to conduct such tests, nor the accuracy of Edwards's tests. JetEx instead challenges Edwards's explanations for the presence of phosphorus and copper, and lack of explanation for nitrogen. But JetEx's challenges go to weight, not reliability or admissibility. Accordingly, JetEx's motion to exclude Edwards's testimony will be denied.

## V.  SCOTTSDALE AIR CENTER'S SUMMARY JUDGMENT MOTION

Scottsdale Air Center argues that a reasonable jury could only conclude that the airplane damage occurred at the Mount Pleasant airport. However, JetEx genuinely disputes nearly every material fact in regard to that theory. Thus, summary judgment is not warranted.

Scottsdale Air Center's motion also focuses heavily on whether a bailment relationship existed between it and JetEx when Harouny left the airplane at Scottsdale Air Center's facilities. The answer to this question may shift the parties' evidentiary burdens.

If a bailment relationship existed, then Scottsdale Air Center "is presumed to be negligent if [it] . . . return[ed] the [airplane] in a damaged condition where the [airplane was] not so damaged when received, and the law imposes on [Scottsdale Air Center] the burden of showing that [it] exercised the degree of care required by the nature of the bailment." 8A Am. Jur. 2d *Bailments* § 231 (footnotes omitted).[1]

This statement of the law contains an important qualification that may preempt analysis of whether a bailment existed. Specifically, a presumption of negligence arises only when the bailee returns damaged property that was "not so damaged when received." *Id*. As noted, the parties contest when the damage happened. Nonetheless, Scottsdale Air Center points out that the existence of a bailment relationship on given facts is a matter for the Court to decide, *Blair v. Saguaro Lake Dev. Co.*, 17 Ariz. App. 72, 74, 495 P.2d 512, 514 (1972), and asks this Court declare as a matter of law that no bailment existed, leaving the burden on JetEx to prove negligence.

Under Arizona law, a bailment exists where there has been

> delivery by the bailor and acceptance by the bailee of the subject matter of the bailment. . . . There must be such a full transfer, actual or constructive, of the property to the bailee as to exclude the possession of the owner and all other persons and give the bailee for the time being the sole custody and control thereof.

*Id.* (quoting *Freeman v. Myers Auto. Serv. Co.*, 226 N.C. 736, 40 S.E.2d 365 (1946)) (internal quotation marks omitted; emphasis removed). Regarding the presumption of negligence specifically, sole custody and control is "[t]he lynchpin of the presumption of negligence" because it "puts the bailee in the superior position regarding the availability of material evidence." 8A Am. Jur. 2d *Bailments* § 231.

Scottsdale Air Center claims that sole custody and control did not exist because The Allen Group also had access to the airplane for the purpose of washing it. Scottsdale

---

[1] Both parties rely on AmJur's exposition of bailment law, presumably because Arizona itself has little case law on the issues at hand. In this situation, the Court accepts the AmJur sections cited in this order as correct statements of controlling law.

1  Air Center further claims that The Allen Group is "a cleaning company not associated
2  with [Scottsdale Air Center]." (Doc. 83 ¶ 10.) JetEx does not deny that The Allen Group
3  had access to the airplane, but disputes the claim that The Allen Group is "not associated"
4  with Scottsdale Air Center. JetEx asserts that Scottsdale Air Center, not The Allen
5  Group, charged Harouny's credit card for the wash service, and that Scottsdale Air
6  Center holds out The Allen Group as an Scottsdale Air Center affiliate. This is a genuine
7  dispute of material fact over the exclusivity of Scottsdale Air Center's control over the
8  airplane. Given such a dispute, the Court has no established facts from which to
9  determine whether a bailment relationship existed. Therefore, summary judgment will be
10 denied on Scottsdale Air Center's claim that no bailment relationship existed between it
11 and JetEx.

12 Finally, Scottsdale Air Center argues that it deserves summary judgment
13 regardless of the Mount Pleasant theory and even if a presumption of negligence applies.
14 In this regard, Scottsdale Air Center believes that it has conclusively rebutted any
15 presumption of negligence because its employees are all "'very adamant' that they 'didn't
16 damage this aircraft.'" (Doc. 82 at 10.) But a simple denial of negligence is not
17 evidence, no matter how certain, and the issue is genuinely disputed in any event. Thus,
18 summary judgment is not appropriate here.

19 IT IS THEREFORE ORDERED that "Defendant's Motion for Summary
20 Judgment" (Doc. 82) is DENIED.

21 IT IS FURTHER ORDERED that Plaintiff's "Motion in Limine to Exclude the
22 Testimony of Expert Witness Dale B. Edwards, P.E." (Doc. 89) is DENIED.

23 ///
24 ///
25 ///
26 ///
27 ///
28 ///

1  IT IS FURTHER ORDERED that Plaintiff's "Motion in Limine to Exclude the Testimony of Expert Witness Juergen Janzik" (Doc. 90) is GRANTED to the extent that Janzik intends to testify in the form of an expert opinion that the damage to the airplane likely did not happen at the Scottsdale Municipal Airport, and DENIED in all other respects.

Dated this 21st day of June, 2011.

*/s/ Neil V. Wake*
Neil V. Wake
United States District Judge